J-S10032-21

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| | | |
|---|---|---|
| COMMONWEALTH OF PENNSYLVANIA | : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| | : | |
| v. | : | |
| | : | |
| TONY BRENT SHOWER, JR. | : | |
| | : | |
| Appellant | : | No. 1071 MDA 2020 |

Appeal from the Judgment of Sentence Entered January 3, 2020
In the Court of Common Pleas of York County Criminal Division at No(s):
CP-67-CR-0007642-2018

BEFORE:  MURRAY, J., McLAUGHLIN, J., and PELLEGRINI, J.[*]

MEMORANDUM BY PELLEGRINI, J.:                    **FILED JUNE 09, 2021**

Tony Brent Shower, Jr. (Shower) appeals from the judgment of sentence of 6 to 15 years' imprisonment imposed by the Court of Common Pleas of York County (trial court) after a jury convicted him of accidents involving death or personal injury and driving under the influence (DUI)—controlled substance.[1] On appeal, Shower challenges (1) the sufficiency of evidence for his accidents involving death or personal injury conviction, and (2) the trial court not giving time credit for the time he spent in pretrial incarceration.  After review, we affirm his conviction but remand for the trial court to determine to which sentence time served should be calculated.

---

[*] Retired Senior Judge assigned to the Superior Court.

[1] 75 Pa.C.S. §§ 3742(a) and 3802(d)(2).

**I.**

On November 22, 2016, a van struck and killed four-year-old D.W. in front of her home in Hanover Borough, York County. The van's driver did not stop at the scene of the accident. A jury later convicted Shower of accidents involving death or personal injury and DUI-controlled substance.[2] Shower does not contest that he was driving or that he knew or should have known that he struck *something*. Instead, he contests that there was enough evidence to prove that he knew or should have known that he struck *a person*.

At trial, Natalie Meckley (Meckley), D.W.'s older half-sister, testified that she drove to York with two of her friends and D.W. on the day of the accident. When the group returned just after 7:00 p.m., Meckley parked across the street from her parents' home. Meckley saw a van "fly past" in the opposite direction as she got out of the car, unaware that D.W. was no longer in the backseat. Meckley then heard a "loud noise" that she described as "an impact sound." At first, she thought that the van hit a "trash can or something." However, when she saw D.W. laying in the roadway, Meckley realized that the van had struck her sister and rushed inside her parents' home to get help.

Matthew Markle (Markle), a neighbor down the street, testified that he heard a "loud crunch" and thought it was a garbage can. Turning toward the

---

[2] The Commonwealth also charged Shower with summary driving under suspension but dismissed the offense after the verdict.

noise, Markle saw a white utility van driving toward him and noticed that it had a roof rack with a ladder. Despite it being dark out, Markle saw that the van's driver was a white male with a dark "scruffy beard or goatee" and had no passenger with him.

Sergeant Matthew Waltersdorff was the first to arrive. After an ambulance left with D.W., he secured the scene and began reconstructing the accident. Based on his review, he made several findings. First, there were no skid marks on the road, suggesting that the driver did not take any evasive actions or brake before or after the accident. Second, there was a trail of blood on the road that included several smears typical of a person being dragged by a vehicle. By mapping the blood marks, Sergeant Waltersdorff determined that the van dragged D.W. over three car lengths from the area of impact to the final resting place. Finally, using footage from a neighbor's security camera, Sergeant Waltersdorff determined that the van was going 22 miles per hour just before the accident.

Within minutes of the accident, the police issued a "be on the lookout" (BOLO) for the van. Officer John Carbaugh testified that he was on patrol in a neighboring township when he saw a van matching the BOLO around 7:30 p.m. After pulling over the van, Officer Carbaugh questioned the driver, Stephen Gambal (Gambal) and his passenger, Shower. Gambal was evasive at first in answering questions. However, when the officer told him the reason for the stop, Gambal became more relaxed and denied being in an accident.

After finding no fresh damage on the van, Officer Carbaugh released Gambal and Shower. A few hours later, however, the police pulled over Gambal again. Gambal was in the van by himself and had crack cocaine and drug paraphernalia. After failing field sobriety tests, he was arrested for DUI and drug possession. As a result, the police towed his van and inspected it again. This time, the police found blond hair in the driver's side headlight, leading to a search warrant for the van; DNA testing of the hair later matched it to D.W., confirming that Gambal's van was involved in the accident.

Lieutenant Scott James, a detective with the District Attorney's office, testified about the damage to the van. First, there was a long scratch on the front bumper that, according to him, matched the zipper on the jacket D.W. was wearing at the time of the accident. He also found several distinct marks on the bumper that he believed were "finger marks" and an apparent fabric transfer pattern on the van, explaining that such transfers are common when a person is struck by a vehicle and their clothing pattern is visible on the car. Moving to the front grill, he testified that the driver's side portion was pushed in while the passenger's side stuck out. Additionally, after he removed the grill, he discovered that there were several pieces of plastic that had broken off and were missing. When he then removed the headlight, he discovered the plastic pieces. In his view, the accident caused this damage, stating that he would not have expected to find the loose pieces if the damage had not been recent.

The Commonwealth's evidence then turned to Shower being the driver, as Gambal recounted what happened the day of the accident. He testified that he was a contractor and that Shower worked for him. On the morning of the accident, he picked up Shower in his van and drove to a job site in Hanover. At the site, the two smoked crack cocaine together. The two then drove to Baltimore to get more crack cocaine. After doing so, the two returned to Pennsylvania in the afternoon but soon drove back to Baltimore, this time buying crack cocaine and heroin. While there, Shower ingested the heroin.

The two left Baltimore around 5 or 5:30 p.m. As they drove home, Shower took over driving because he wanted to go to his methadone clinic. When he realized the clinic was closed, Shower drove back to Hanover and wanted to get more drugs. Because he needed to go alone to get the drugs, Shower dropped Gambal off at a local bar and drove off in the van.

According to Gambal, Shower came back about 20 minutes later. As soon as he returned, Shower told Gambal that he needed to drive the van. Gambal assumed Shower had drugs on him and took over driving the van. Not long after, however, the police pulled the van over. Gambal recalled he was nervous at first but was fine after the police told him the reason for the stop. After the police released them, Shower wanted to go home. As they drove, the two did not discuss what happened. When they finally arrived, Shower got out of the van without waiting for Gambal to come to a complete stop. As he hurried out, Shower left behind a bag with several prescription

pill bottles in his name. Gambal then went back to Baltimore to get more crack cocaine before returning to Pennsylvania and being arrested.

The Commonwealth's final witness was the lead investigator, Officer Jared Auman. In October 2018, he re-interviewed Mathew Markle about seeing the van's driver after the accident. Officer Auman showed Markle two photo arrays—one with Gambal in it, the other with Shower in it. Markle made no identification in the first array that included Gambal. In the second array, however, Markle selected four individuals as possibly being the driver, including Shower.

Officer Auman further testified about Shower's post-accident statements. Shower gave his first statement the day after the accident. In that statement, he claimed that he was asleep while Gambal drove the van and that he never heard anything. Officer Auman re-interviewed Shower in May 2017 after obtaining a prison phone call in which Gambal told his mother that Shower dropped him off to get drugs. Shower again denied that he drove the van the night of the accident. In August 2017, however, Shower reached out to the police to give a third statement. Though he still denied driving the van, Shower now claimed that he heard a thud while Gambal was driving. When Shower asked what happened, Gambal responded that he hit something. Gambal then pulled over farther down the road. According to Shower, Gambal was "pale white" and said, "I believe I just hit a kid."

After Shower presented no evidence, the jury found him guilty of both accidents involving death or personal injury and DUI—controlled substance. The trial court sentenced him to serve 5 to 10 years' imprisonment for accidents involving death or personal injury and a consecutive 1 to 5 years for DUI, thus giving him an aggregate sentence of 6 to 15 years. After the denial of a timely filed post-sentence motion, Shower filed this appeal.[3]

**II.**

Shower first challenges the sufficiency of the evidence for his conviction for accidents involving death or personal injury.[4] That offense is defined in Section 3742 of the Vehicle Code as follows:

---

[3] The 120-day period for decision on Shower's post-sentence motion expired before the trial court entered its order denying the post-sentence motion. The clerk of courts, however, failed to enter an order denying the motion by operation of law. This Court has held that a court breakdown occurs when the trial court clerk fails to enter an order deeming post-sentence motions denied by operation of law under Pa.R.Crim.P. 720(B)(3)(c), and a breakdown in the processes of the court grants this Court jurisdiction over an untimely appeal. *See Commonwealth v. Flowers*, 149 A.3d 867, 872 (Pa. Super. 2016) (breakdown in court operation granted this Court jurisdiction over untimely appeal). We decline to quash the appeal.

[4] Our standard and cope of review of a sufficiency claim is well-settled:

The standard we apply in reviewing the sufficiency of the evidence is whether viewing all the evidence admitted at trial in the light most favorable to the verdict winner, there is sufficient evidence to enable the fact-finder to find every element of the crime beyond a reasonable doubt. In applying the above test, we may not weigh the evidence and substitute our judgment for the fact-finder. In addition, we note that the facts and circumstances established by the Commonwealth need not preclude every possibility of

- 7 -

**(a) General rule.--**The driver of any vehicle involved in an accident resulting in injury or death of any person shall immediately stop the vehicle at the scene of the accident or as close thereto as possible but shall then forthwith return to and in every event shall remain at the scene of the accident until he has fulfilled the requirements of section 3744 (relating to duty to give information and render aid). Every stop shall be made without obstructing traffic more than is necessary.

75 Pa.C.S. § 3742(a).

While the statute does not have a *scienter* requirement, this Court has interpreted Section 3742 as requiring the Commonwealth to establish that the "driver knew or should have known" that he was involved in an accident involving personal injury or death. ***See Commonwealth v. Kinney***, 863 A.2d 581, 585-86 (Pa. Super. 2004); ***Commonwealth v. Woosnam***, 819 A.2d 1198, 1206 (Pa. Super. 2003).

---

innocence. Any doubts regarding a defendant's guilt may be resolved by the fact-finder unless the evidence is so weak and inconclusive that as a matter of law no probability of fact may be drawn from the combined circumstances. The Commonwealth may sustain its burden of proof of proving every element of the crime beyond a reasonable doubt by means of wholly circumstantial evidence. Moreover, in applying the above test, the entire record must be evaluated and all the evidence actually received must be considered. Finally, the trier-of-fact while passing upon the credibility of witnesses and the weight of the evidence produced, is free to believe all, part or none of the evidence.

***Commonwealth v. Widger***, 237 A.3d 1151, 1156 (Pa. Super. 2020) (citation omitted).

Shower contends that there was insufficient evidence that he knew or should have known that he hit a person. He first argues that there is no evidence that he saw D.W. before impact, as the accident reconstructionist testified that there were no skid marks to suggest that the driver tried to avoid anything in the road. Shower also asserts that the impact would not have alerted him that he struck a person. For this point, he relies on the small size of the four-year-old D.W., who was 41 inches tall and weighed 32.5 pounds. While he concedes that the police discovered damage to the van, Shower characterizes this damage as "relatively minor" and not enough to infer that he would have known that he struck a person. He makes the same argument about the sound of the impact, as both Meckley and Markle at first thought the van hit a trash can. At most, Shower asserts, the driver would have known only that he struck an animal or trash can but not necessarily a person. Finally, Shower minimizes the inculpatory nature of his post-accident conduct, arguing that it is speculative to interpret it as showing a consciousness of guilt.

Viewing the evidence in the light most favorable to the Commonwealth as verdict winner, the Commonwealth presented evidence on the accident itself that allowed the jury to find that Shower should have known he struck a person rather than something else.

First, there was the sound of the impact. Three witnesses testified about hearing the accident when it happened. Meckley described hearing a "loud noise" just as the van passed by, testifying that it sounded like the van

"crashed into something" and made an "impact sound." N.T., 11/19/19, at 121. Cameron Balmaceno, one of Meckley's friends, described hearing a "boom" that made a "mediumish" loud noise. *Id*. at 187. Finally, despite being farther away than the other two, Markle heard a "large crunch." *Id*. at 149. If these witnesses heard the impact, then the jury could reasonably infer that Shower heard it too because he was driving the van.

Next, there was the damage to the front of the van. First, the van struck D.W. hard enough that her hair was found in a crack in the headlight's plastic housing. According to Lieutenant James, it appeared that the impact was hard enough to split the plastic and then close back together with the hair inside. N.T., 11/20/19, at 363. Consistent with this, the front grill on the driver's side was noticeably recessed near where D.W.'s hair was found. *Id*. at 372. There were several areas in the front of the van with broken pieces or damage, including the grill, radiator and headlight housing. *Id*. at 373-74. After removing the headlight, Lieutenant James found some of the missing pieces, suggesting that the accident caused the damage. *Id*. at 374-75. The same was true of the other marks on the front of the van. This included the distinct marks on the front bumper that Lieutenant James suggested were "finger marks" from D.W. *Id.* at 370. He also found a long scratch that he believed was made with the zipper to D.W.'s jacket. *Id.* at 381. While Shower considers this damage as "relatively minor," the jury could still conclude that it was extensive enough to infer that Shower would have felt the impact.

Besides the sound and damage, the evidence showed that the van dragged D.W. after striking her. Sergeant Waltersdorff was qualified as an expert in accident reconstruction and testified that he found "drag marks of blood smears." N.T., 11/19/19, at 211. These smears, he testified, were "typical of a person being drug by a vehicle[.]" *Id*. at 213. As part of his reconstruction of the accident, he marked all the blood on the roadway and created a diagram map showing the area of impact to the final resting place. *Id*. at 214. The Commonwealth admitted this diagram along with multiple photos of the blood, showing the jury that the van dragged D.W. in the roadway for over three car lengths. *Id*. 215-17.

Shower contends that this evidence proves only that he would know that he struck something, asserting that the evidence could equally lead to the conclusion that he believed that he hit a dog, trash can or shopping cart instead of a person. However, that argument is belied by his post-accident conduct and statements probative of his knowledge that he hit a person as opposed to a dog or trash can. First, as the trial court aptly summarizes, the jury could infer that Shower's conduct right after the accident evidenced that he knew that he had just struck a person:

> After driving Mr. Gambal's van alone, [Shower] returned to Mr. Gambal and stated that Gambal had to drive. Following the police stop, [Shower] expressed a desire to return home immediately. Upon arrival at his residence, [Shower], per Mr. Gambal's testimony, did not even seem to wait for the van to come to a complete stop before exiting, nor did he engage in any parting pleasantries with the man he had spent the day obtaining and utilizing drugs with. In his haste, [Shower] left his bag in Mr.

- 11 -

> Gambal's van. This hurried demeanor is in stark contrast to that of Mr. Gambal whom an officer described as calming down after having heard about a little girl being struck. The jury could draw a common-sense inference that [Shower's] demeanor related to knowledge of having struck a human being with a vehicle.

Trial Court Opinion (TCO), 10/29/20, at 7-8.

Second, his post-accident statements to the police indicate that he was aware that he had hit a person. After giving his first two statements, Shower contacted the police and requested that he be allowed to give a third statement in which he tried to shift the blame and claim Gambal was driving and knew that he hit a kid. Shower's statement, however, was directly contradicted by Markle and his identification of Shower and not Gambal as possibly being the driver with facial hair and no passenger. The jury, however, did not believe Shower's version of events and was free to use his attempt to blame Gambal as evidence of his consciousness of guilt.

Taken all together, viewed in the light most favorable to the Commonwealth, there was sufficient evidence for the jury to find that Shower knew or should have known that he hit a person while he was driving the van. This is based not only on the evidence about the accident itself, but also his post-accident conduct and statements—all of which the jury was free to resolve in the Commonwealth's favor.

**III.**

In his other issue, Shower contends that the trial court erred at sentencing by failing to give time credit for the 415 days that he was

incarcerated for failing to post bail on these charges.[5]  The Commonwealth responds that Shower seeks "double credit" because that period of incarceration has already been credited toward probation violations on prior York County cases for which Shower was detained while he was unable to post bail.  The trial court, meanwhile, agrees with Shower and acknowledges that it failed to make a determination at sentencing whether he was entitled to credit for pretrial incarceration.  As a result, the trial court asks that we correct the time credit issue or remand.  **See** TCO at 11.

Credit for time served is governed by 42 Pa.C.S. § 9760, which provides, in pertinent part:

> (1) Credit against the maximum term and any minimum term shall be given to the defendant for all time spent in custody as a result of the criminal charge for which a prison sentence is imposed or as a result of the conduct on which such a charge is based.  Credit shall include credit for time spent in custody prior to trial, during trial, pending sentence, and pending the resolution of an appeal.
>
> * * *
>
> (4) If the defendant is arrested on one charge and later prosecuted on another charge growing out of an act or acts that occurred prior to his arrest, credit against the maximum term and any minimum term of any sentence resulting from such prosecution shall be given for all time spent in custody under the former charge that has not been credited against another sentence.

---

[5] "A claim asserting that the trial court failed to award credit for time served implicates the legality of the sentence." **Commonwealth v. Gibbs**, 181 A.3d 1165, 1166 (Pa. Super. 2018) (citation omitted).  Issues relating to the legality of a sentence are questions of law. **Commonwealth v. Aikens**, 139 A.3d 244, 245 (Pa. Super. 2016).  Our standard of review over such questions is de novo and the scope of review is plenary.  **Id.**

42 Pa.C.S. § 9760(1) and (4).

"Section 9760 does not contemplate credit for time served to be awarded twice. Similarly, our Courts have consistently held that such double credit for time served is neither contemplated, nor authorized, by Section 9760[.]" ***Barndt v. PA Dept. of Corrections***, 902 A.2d 589, 595 (Pa. Cmwlth. 2006); ***see also Taglienti v. Dep't of Corrections***, 806 A.2d 988, 993 (Pa. Cmwlth. 2002) ("[C]redit for time served prior to the sentencing date is governed by Section 9760 which does not provide for credit for time on unrelated offenses or when credit has been already credited against another sentence.").

At sentencing, Shower's counsel noted that he had been in pretrial incarceration for 415 days. N.T., 1/3/20, at 16. Counsel, however, never requested that the trial court order that Shower receive time credit for his period of pretrial incarceration. Likewise, neither the trial court nor the Commonwealth raised the issue at the sentencing hearing. As a result, no record was developed on whether Shower's period of pretrial incarceration was previously applied toward other cases for which he was detained. Although the Commonwealth appends the docket sheets to the other cases to its brief, none of the docket entries reflect that his period of pretrial incarceration has already been applied to those cases.

For these reasons, out of caution, we remand for the trial court to examine the award of time credit as we are unable to determine if Shower is

entitled to credit for the period of incarceration that he seeks. We vacate his judgment of sentence and remand for the trial court to conduct an evidentiary hearing to determine whether Shower is entitled to time credit under Section 9760 for the period that he was unable to post bail in this case (November 15, 2018, to January 3, 2020).

Conviction for accidents involving death or person injury affirmed. Judgment of sentence vacated. Case remanded with instructions. Jurisdiction relinquished.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary

Date: 6/9/2021